**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MICHELLE TIERNEY, | : | |
| | : | Civil Action No. 08-1918 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MICHELLE RICCI, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

Petitioner pro se                        Counsel for Respondents
Michelle Tierney                         Simon Louis Rosenbach
Edna Mahan Correctional                  Middlesex Co. Pros. Ofc.
     Facility                            25 Kirkpatrick Street
P.O. Box 4004                            New Brunswick, NJ 08901
Clinton, NJ 08809

**WIGENTON**, District Judge

Petitioner Michelle Tierney, a prisoner currently confined at the Edna Mahan Correctional Facility in Clinton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondents are Michelle Ricci and the Attorney General of New Jersey.

For the reasons stated herein, the Petition must be denied.

I.   BACKGROUND

A.   Factual Background

The relevant facts are set forth in the opinion of the
Superior Court of New Jersey, Appellate Division.[1]

> Defendant killed Thomas Harsell, her live-in
> boyfriend and the father of their sixteen-month-old
> child.  She does not deny the homicidal act.  The
> relationship between defendant and Harsell was a
> volatile one, marked by incidents of verbal and
> physical altercations.  Harsell was thirty-nine-years-
> old and physically larger and stronger than defendant,
> who was twenty-five-years-old.
>
> On the day of the homicide, August 30, 1998,
> defendant, Harsell and their child spent the day at the
> beach.  On the way home they argued, and defendant
> claims Harsell punched her in the face while in the
> car.  The argument continued at home and included
> physical striking by both parties.  Defendant went to
> the kitchen and called her brother, Michael Tierney,
> requesting that he come and get her.  Defendant
> acknowledges that she struck Harsell in the head
> several times with the phone.  According to Jeremy
> Rutan, Harsell's nephew and a resident of the same
> household, Harsell came out of the kitchen holding his
> head, which was bleeding profusely, exclaiming, "You
> bitch.  You bitch.  You bitch."
>
> Harsell's brother, Robert Harsell, was also a
> resident of the household and was present during these
> events.  He was downstairs, when he heard the argument
> coming from upstairs.  He was accustomed to defendant
> and his brother fighting and said to himself "here we
> go again."  Robert heard what sounded like "someone ...
> wrestling on the floor."  Robert saw his brother

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding
instituted by an application for a writ of habeas corpus by a
person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be
presumed to be correct.  The applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence."

bleeding from the head, but when his brother re-entered the house, Robert went back downstairs because he did not want to "interfere" in the fight.

Michael Tierney and a friend, Paul Dixon, arrived. Michael and Harsell argued outside. Michael was angered that Harsell had struck his sister, and he informed Harsell that he was getting her out of there. Harsell told Michael to leave, that it "was none of his business." Defendant came outside, angry, and began striking Harsell in the face, yelling "You won't hit me in front of my brother now." Michael instructed his sister to go inside and get her belongings. When she went in, Michael and Harsell engaged in a physical altercation in which Dixon participated.

When defendant emerged from the house, she was carrying a knife with an eleven-inch blade. She approached Harsell and her brother, who were on the front steps. Dixon took the knife from defendant and placed it on the front seat of Michael's car. Dixon then escorted defendant to the back seat of Michael's car. Harsell and Michael continued to argue. They came over to the car. According to defendant, Harsell reached in and punched her in the face. While Harsell was standing outside the car with his back to the car, continuing to converse with Michael, defendant retrieved the knife from the front seat and stabbed Harsell once in the back, causing his death. Michael and Dixon immediately entered the car and drove off with defendant. ...

Defendant testified and described how Harsell repeatedly kicked, punched, smacked and choked her that evening. She called her brother to come and get her and the child because she was "in fear of [her] life." She stated Harsell threatened earlier in the evening that if she left he would kill her and she would never again see their child. Throughout the incident, Harsell was attempting to prevent her from leaving. She also described prior incidents where they fought physically, insisting Harsell was always the initiator. She acknowledged stabbing Harsell on one occasion in the chest with scissors. On another occasion she acknowledge cutting Harsell's tongue with the same knife with which she later killed him. She stated he placed the knife to his face because he was upset and stated he wanted to die, and she pushed it causing his

injury.  Defendant acknowledged that Harsell never used or threatened the use of any weapons on the prior occasions or the night of the killing.

...

Both sides presented psychological experts on battered woman's syndrome.  Dr. Marsha Kleinman, testifying for the defendant, defined the syndrome as

a woman who is 18 years of age or older who is or has been in a relationship in which she was subjected to psychological abuse which means name calling, verbal put-downs, humiliation, where there is excessive possessiveness and/or jealousy, where the batterer is excessively controlling of her whereabouts.  There may or may not be physical or sexual abuse ... .  It's a relationship in which somebody is threatened with future harm for not doing what the person wants them to do.

She further testified that to establish the syndrome, there must be at least two cycles of abuse. First, there is a period in which tension builds up until there is a violent outburst.  This is followed by the batterer's apology, leading the victim to believe he will change and things will be better, which they are for a time.  Then tensions begin to build again and the cycle repeats itself.

With respect to a battered woman who kills, Dr. Kleinman stated that an escalation of violence, worse than on previous occasions, normally precedes the victim's reaction to kill her batterer.  Battered woman's syndrome is used to explain not only why a woman does not leave an abusive relationship but also why she has reason to fear for her life.  Dr. Kleinman opined that defendant's relationship with Harsell fit the description of battered woman's syndrome.

Dr. Sandra L. Morrow testified for the State.  She substantially agreed with the definition of battered woman's syndrome and the need for at least two cycles as described by Dr. Kleinman.  Dr. Morrow emphasized, however, that for the syndrome to apply, the woman "must feel entrapped and unable to escape.  She must

have a desire to escape the situation, to not be in an
abusive relationship any longer, and she must feel that
she is unable to escape for whatever reason."  In an
interview defendant expressed to Dr. Morrow that her
relationship with Harsell "was the greatest
relationship she ever had."  Harsell never told
defendant how to dress or with whom she should or
should not talk or associate.  He never restricted her
use of the phone or prevented her from coming or going
as she pleased.

Dr. Morrow opined that defendant did not suffer
from battered woman's syndrome.  When asked what
factors related to the syndrome she found to be
lacking, she replied:

I did [n]ot find cycles to have been
occurring, cycles of domestic violence.  I
did not find sex abuse to be occurring.  I
did not find consistent threats to hurt or
kill herself by her partner.  I did not find
there to be excessive jealously, isolation,
possessiveness, keeping her isolated from
other people.  I did not find what's called
correlates of violence in the partner, the
partner had been abusing animals or abusing
other people on a routine basis or abusing
children.  There was no history I found in
this investigation to indicate he was someone
who did that.  Those were all absent.  Those
are many of the things one looks for.

State v. Tierney, 356 N.J. Super. 468, 472-74, 475-76 (N.J.Super.

App. Div. 2003).

B.   Procedural History

Following a jury trial, Petitioner was convicted of first-

degree knowing or purposeful murder, N.J.S.A. 2C:11-3a(1), (2)

(count one), and third-degree possession of a weapon for an

unlawful purpose, N.J.S.A. 2C:39-4d (count two).  On the murder

count, the trial court sentenced Petitioner to a thirty-year term

of imprisonment, without eligibility for parole, and on the weapons count, the trial court sentenced Petitioner to a concurrent four-year term of imprisonment.

On direct appeal, the Superior Court of New Jersey, Appellate Division, affirmed.  State v. Tierney, 356 N.J. Super. 468 (N.J. Super. App. Div. 2003).  The Supreme Court of New Jersey denied certification.  State v. Tierney, 176 N.J. 72 (2003).  Petitioner did not petition the United States Supreme Court for a writ of certiorari.

Petitioner then filed a timely state court petition for post-conviction relief.  Following an evidentiary hearing, on November 15, 2004, the trial court denied relief.  The Appellate Division affirmed the denial of relief.  State v. Tierney, 2007 WL 1836662 (N.J. Super. App. Div. June 28, 2007).  The Supreme Court of New Jersey denied certification.  State v. Tierney, 192 N.J. 598 (2007).  This Petition followed.

Briefing is now complete and this matter is ready for determination.

## II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State

6

court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II).  A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme

Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court

does not contradict relevant Supreme Court precedent." <u>Priester</u> <u>v. Vaughn</u>, 382 F.3d 394, 398 (3d Cir. 2004) (citing <u>Early v.</u> <u>Packer</u>, 537 U.S. 3 (2002); <u>Woodford v. Visciotti</u>, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. <u>See</u> 28 U.S.C. § 2254(b)(2); <u>Lambert v.</u> <u>Blackwell</u>, 387 F.3d 210, 260 n.42 (3d Cir. 2004); <u>Lewis v.</u> <u>Pinchak</u>, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. <u>Estelle</u> <u>v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. <u>See Royce v. Hahn</u>, 151 F.3d 116, 118 (3d Cir. 1998); <u>Lewis v. Attorney General</u>, 878 F.2d 714, 721-22 (3d Cir. 1989); <u>United States v. Brierley</u>, 414 F.2d 552, 555 (3d Cir. 1969), <u>cert. denied</u>, 399 U.S. 912 (1970).

III. <u>ANALYSIS</u>

A. <u>Jury Instructions</u>

Petitioner asserts that the trial court instructions were deficient as follows: (1) the jury instruction on

9

passion/provocation manslaughter was deficient because it instructed the jury to consider objective as well as subjective standards,[2] and (2) the trial court failed to summarize the testimonial evidence on battered woman's syndrome, which thus deprived the jury of a factual context for the defense, in conjunction with the lesser-included offense.

Generally, a jury instruction that is inconsistent with state law does not merit federal habeas relief. Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> [t]he only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction ..., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted). Thus, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of

---

[2] More specifically, Petitioner challenges the trial court's failure to include an instruction that a course of conduct might amount to reasonable provocation, even if a single event does not.

proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (1997). See also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it generally is subject to "harmless error" analysis. Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Id. at 418 (citing California v. Roy, 519 U.S. 2, 5 (1996)). In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in
> artificial isolation, but must be viewed in the context
> of the overall charge. If the charge as a whole is
> ambiguous, the question is whether there is a
> reasonable likelihood that the jury has applied the
> challenged instruction in a way that violates the
> Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence." Cool v. United States, 409 U.S. 100, 104 (1972).  "[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." Victor v. Nebraska, 511 U.S. 1, 22 (1994); see also Cage v. Louisiana, 498 U.S. 39, 41 (1990).  As the Supreme Court explained in Victor,

> so long as the court instructs the jury on the
> necessity that the defendant's guilt be proved beyond a
> reasonable doubt, the Constitution does not require
> that any particular form of words be used in advising
> the jury of the government's burden of proof.  Rather,
> taken as a whole, the instructions [must] correctly
> conve[y] the concept of reasonable doubt to the jury.

Victor, 511 U.S. at 6 (citations and internal quotation marks omitted).

"[A] misdescription of the burden of proof ... vitiates all the jury's findings. Sullivan v. Louisiana, 508 U.S. 275, 281 (1993) (emphasis in original).  Such an error is considered structural and thus is not subject to harmless error review.  See id. at 280-82.  But see Neder v. United States, 527 U.S. 1, 8-11 (1999) (applying harmless-error analysis where jury was not instructed on an element of an offense).

Here, on direct appeal, the Appellate Division rejected Petitioner's challenges to the jury instructions.

Defendant argues on appeal that the jury instructions on self-defense and passion/provocation manslaughter were deficient because they failed to provide a factual context for fair consideration of battered woman's syndrome.  Defendant did not object to the instructions in the trial court, R. 1:7-2, nor did defendant proffer any requests for instructions, R. 1:8-7.  Indeed, on several occasions throughout the trial, Judge DeVesa invited the parties to submit requests to charge, and he furnished the parties with his tentative charges.  Defense counsel consistently expressed his approval of the charges as framed by the judge.

Accordingly, our review is under the plain error standard, and we will disregard the alleged error unless it is "clearly capable of producing an unjust result."  R. 2:10-2.  "Under that standard, defendant has the burden of proving that the error was clear and obvious and that it affected [her] substantial rights." The error claimed must be so egregious that it "rais[es] a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."

Where, as here, the claimed error pertains to a portion of the jury charge, the charge must be examined as a whole to "determine its overall effect."  In considering a jury charge, plain error is "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed the clear capacity to bring about an unjust result."

Evidence of domestic abuse is relevant to a claim of self-defense.  Expert testimony relating to battered woman's syndrome is germane to the jury's assessment of the subjective honesty as well as the objective reasonableness of a defendant's belief that deadly force was necessary to protect herself against death or serious bodily harm.  Expert testimony is useful to refuse common misconceptions concerning evidence of

13

prior abuse and the reaction of battered women.  The
Court likewise recognized the importance of battered
woman's evidence on the issue of passion/provocation
manslaughter:

> It is well settled that when there is
> evidence of prior physical abuse of defendant
> by the decedent, the jury must be told that a
> finding of provocation may be premised on "a
> course of ill treatment which can induce a
> homicidal response in a person of ordinary
> firmness and which the accused reasonably
> believes is likely to continue."  The jury
> must be instructed "to consider not only
> decedent's conduct and threats that night,
> but also his prior mistreatment of
> defendant."

Defendant does not contend that she was restricted
in her ability to present lay and expert testimony
regarding prior abuse and the battered woman's
syndrome.  She contends the judge's "passing reference"
to this evidence was inadequate to properly apprise the
jury of its significance.  Judge DeVesa charged the
jury, following the Model Jury Charges, on self-
defense, defense of another (defendant's brother), and
passion/provocation manslaughter.  He supplemented the
charge with specific references to the alleged prior
abuse of defendant by Harsell and the battered woman's
syndrome evidence.

The charge included a N.J.R.E. 404(b) limiting
instruction:

> Now, an example of that in this case is the
> evidence that has been introduced that the
> defendant and Thomas Harsell have assaulted
> each other during the course of their
> relationship.  Normally such evidence is not
> permitted under our rules of evidence and
> this is because our rules specifically
> exclude evidence that a defendant has
> committed uncharged crimes, wrongs, or acts
> when it is offered only to show that a
> defendant has a disposition or a tendency to
> do wrong and therefore must be guilty of the
> charges in the present case.

14

However, our rules do permit evidence of uncharged crimes, wrongs, or acts when the evidence is used for some other purpose.  Now in this case the evidence, if you choose to believe it and, remember, when I comment on the evidence, the first determination you have to make as jurors is whether you believe that that's what the evidence has shown or hasn't shown.  But in any event in this case that <u>evidence of this prior violence</u> if you choose to believe it has been introduced only for one specific narrow purpose and that is <u>to establish the honesty and reasonableness of the defendant's belief and the need to use deadly force for self protection and the protection of her brother on the date of the homicide.</u>

Now whether this evidence does, in fact, support that specific purpose for which it has been offered is for you to decide.  You may decide that the evidence does not support this purpose and it is not helpful to you at all.  In that case you may disregard this evidence.  On the other hand, you may decide that the evidence does support the purpose for which it has been offered and you may use it for that specific purpose and that purpose alone.

What you may not do is use the evidence to decide that this defendant has a tendency to commit crimes or that she is a bad person. That is, you may not decide that just because you are satisfied that she had previously assaulted Thomas Harsell she must be guilty of the crimes in question in this trial.  <u>I have admitted the evidence of prior violence or prior assaults only to help you decide the specific question of the honesty and reasonableness of the defendant's beliefs to use deadly force on the evening in question.</u> You may not consider it for any other purpose and may not find the defendant guilty of the crimes charged simply because she had assaulted Thomas Harsell in the past.

In charging murder-passion/provocation manslaughter the judge charged that for defendant to be guilty of murder, the State must prove beyond a reasonable doubt that defendant did not act in the heat of passion resulting from a reasonable provocation:

> In order for the State to carry its burden it must prove beyond a reasonable doubt that the provocation was not sufficient to arouse the passions of an ordinary person beyond the power of her control.  In this regard words alone do not constitute adequate provocation. On the other hand, a threat with a weapon, a significant physical confrontation <u>or a prolonged course of physical abuse by the deceased that the defendant reasonably believed would continue might be considered adequate provocation</u>.  Again, the State must prove that provocation was not adequate.
>
> ...
>
> <u>In determining whether the State has proven the defendant did not act in the heat of passion resulting from reasonable provocation you may also consider in this regard the testimony that you have heard relating to the battered women's syndrome.</u>

The self-defense charge explained that the use of deadly force may be justified only to defend against force or the threat of force of nearly equal severity and is not justified unless the defendant reasonably believes that such force is necessary to protect herself against death or serious bodily injury.  The charge included the following:

> A reasonable belief is one which would be held by a person of ordinary prudence and intelligence situated as this defendant was. Self-defense exonerates a person who uses force in the reasonable belief that such action was necessary to prevent his or her death or serious injury even if that belief is later proven to be mistaken.  Accordingly, the law requires only a reasonable belief, not necessarily a correct, judgment.

16

<u>In this regard, evidence has been introduced
explaining the battered women's syndrome.
You may consider this evidence for the
purpose of determining whether the defendant
honestly and reasonably believed that deadly
force was necessary to protect herself
against Thomas Harsell.</u>

...

We are satisfied that the charge as a whole
properly guided the jury to consider evidence of prior
abuse and of battered woman's syndrome in its
evaluation of defendant's claims of self-defense and
reasonable provocation.  The charge adequately
instructed the jury to consider alleged prior abuse and
its effect on defendant, as well as the events on the
occasion of the homicide, in evaluating both claims by
defendant.  This charge does not suffer from infirmity
identified in <u>State v. Gartland</u>, where the judge
instructed the jury to consider evidence of prior abuse
in determining the issue of provocation but did <u>not</u>
charge that such evidence should be considered in
determining the issue of self-defense.  <u>State v.
Gartland</u>, <u>supra</u>, 149 N.J. at 472-73, 694 A.2d 564.

We further note that defense counsel argued
vigorously in summation the self-defense theory,
incorporating the battered woman's syndrome aspect:

Self-defense.  That's what this case is all
about.  In my opening I said a police officer
in the line of duty, he kills, that's a
homicide, but many times, oftentimes it's a
justifiable homicide.  An intruder in a home
comes into a home threatens one's family,
puts someone in immediate terror of getting
hurt, that person gets killed.  That's a
homicide.  That's a justifiable homicide.  <u>A
man beating a woman relentlessly, not
allowing her to leave, beating her brother,
beating the daylights out of anyone getting
in his way, ignoring everything, an out of
control individual is what she was dealing
with.  What was in her mind.  This is the
first time she had ever been threatened to be
killed.  First time she had ever lost her
child.  You don't have to be a genius to</u>

<u>figure this out, members of the jury.  That's</u>
<u>supported by Dr. Kleinman.</u>

"The argument of counsel, although not a
substitute for a correct charge, can mitigate the
prejudicial effect of an erroneous charge."  It is not
plain error when jury instructions are not incorrect
but merely capable of being improved. ...

In view of the evidence presented and arguments
made by both parties, and the charge given, we are
satisfied the jury understood the significance of the
alleged prior abuse and battered woman's syndrome.  Any
suggestions defendant now makes that could have
improved the charge by making it more detailed and
specific do not render the charge erroneous.  We find
no error, and, certainly, in light of the extensive
evidence and arguments presented by the parties, no
plain error.

We recognize that accurate and understandable jury
instructions in criminal cases are essential to a
defendant's right to a fair trial and that it is
sometimes necessary to go beyond the Model Jury Charges
to properly guide the jury.  "[T]he better practice is
to mold the instruction in a manner that explains the
law to the jury in the context of the material facts of
the case."  Nevertheless, "not every failure to do so
is fatal."

In this case, there was no need for explanation
beyond that given by the trial judge, either in
reference to the facts of the case or in a more
detailed explication of the legal principles.
Defendant expressly declined the opportunity to propose
further explanation in either regard.  The charge
appropriately explained the law in accordance with the
theories of the case as put forward by the parties
through their evidence and arguments.

<u>State v. Tierney</u>, 356 N.J. Super. at 477-82 (citations omitted)

(emphasis added by Appellate Division).

Here, the state courts have determined that the challenged

jury instructions correctly conveyed the governing state law

principles to the jury.  Nothing in the challenged instructions operated to lift the government's burden of proof on an essential element of the charged crimes.  To the contrary, the instructions repeatedly emphasized the government's burden of proof. Petitioner is not entitled to relief on this claim.

B.    Ineffective Assistance of Trial Counsel

Petitioner asserts that trial counsel was ineffective in (1) failing to investigate the facts of the case and represent Petitioner vigorously,[3] (2) failing to communicate a plea offer, and (2) failing to ask the trial court to summarize the testimonial evidence on battered woman's syndrome in its charge to the jury.

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The right to counsel is "the right to <u>effective</u> assistance of counsel."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance

_____

[3] More specifically, Petitioner challenges trial counsel's reaction to alleged interaction between a juror and the victim's family, counsel's failure to request a change of venue, and counsel's failure to call as a witness an investigator who had taken pictures of Petitioner's bruised body a few days after the homicide.

fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different.  Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  Strickland at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed."  Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Id. at 690-

91.  If counsel has been deficient in any way, however, the
habeas court must determine whether the cumulative effect of
counsel's errors prejudiced the defendant within the meaning of
Strickland.  See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d
Cir. 1996).

The trial court denied all post-conviction relief and the
Appellate Division affirmed.

> As to the ineffectiveness of trial counsel,
> defendant testified that she met with her trial
> attorney approximately ten times before she appeared in
> court, but they very rarely spoke about her criminal
> case, discussing personal matters instead. She admitted
> that her attorney presented a plea offer of ten to
> twenty years and that he felt that "[t]he judge will
> probably give you ten." Defendant testified that her
> attorney suggested that she turn it down "because all
> of the evidence was in [her] favor." Defendant
> testified that she was not prepared for her testimony,
> her attorney never discussed her testimony with her,
> and she was not told what to expect on cross-
> examination. Defendant claimed that her attorney
> ignored a number of notes and suggestions she gave him
> regarding impeachment possibilities for witnesses and
> discrepancies in discovery. She also claimed that her
> attorney did not move for a change in venue after being
> advised that the victim's brother was running for mayor
> in the town where the crime was committed, which was in
> the county where the trial was conducted.

> Defendant also claimed that her attorney failed to
> address some jury issues properly. The court addressed
> an issue where defendant's friend saw jury members
> talking to the family, but the court determined that no
> wrongdoing took place. She told her attorney that a
> juror "nodded their head yes to the family before [the]
> verdict was read," but her attorney did not respond.
> During sentencing, she noticed that the same juror whom
> she observed talking to the family during to the trial
> was present for the sentencing. She claimed that her
> attorney only brought it up because she threatened to
> do so if he did not. Even though she trusted her

attorney during the trial, she was not satisfied with his performance.

Defendant's trial attorney testified that he has been practicing law since 1985 and every time he took on a case he had to prepare as if it were going to trial. He was working in private practice and had been assigned the case from the public defender's office. From a discussion with the public defender regarding defendant's case, the attorney concluded that it was "a Battered Woman Syndrome-type case." His first action was to get an expert, Marsha Kleinman. He had at least a dozen meetings with defendant for trial preparation. He admitted to speaking of personal things with defendant and informed defendant such conversation was to help her feel at ease. It was also an attempt for him to determine defendant's overall credibility and prepare her for cross-examination. He said that he had a good relationship with defendant.

The attorney testified that, given the facts of this case, a Battered-Woman-Syndrome defense was the best way to go and he had numerous discussions with Dr. Kleinman regarding the defense. Prior to his cross-examination of the State's expert, he had a conversation over lunch with Kleinman and used information obtained from that discussion during his cross-examination. He did not recall the information defendant accumulated regarding Battered-Woman Syndrome. His evaluation of Kleinman was adequate, not extraordinary. He believed that defendant knew from the beginning that she would be testifying, but asserted that no one is ever really ready to testify at the time of trial.

A last-minute plea bargain was offered for aggravated manslaughter with a presumptive term of twenty years. Defendant's attorney discussed it with defendant and presented the pros and cons. He was hopeful for a shot at "a second degree, but ... would never force anybody to take anything." He would not suggest what he would do in the client's situation or guarantee anything. He did not recall defendant's demeanor in her response to the offer. The attorney testified that it never occurred to him to seek a change in venue and did not recall if defendant ever requested a change in venue.

22

The only thing that the attorney knew about Sandra Morrow, the State's expert, was her report. He did not speak with her or investigate her background, even though she had some licensing problems in 1985. He felt that, because the trial took place in 2000, the licensing problem was not current enough to be relevant and that the verdict was not a result of either expert's testimony.

By and large, the attorney did not recall the problems that defendant claimed occurred with the jury, but testified that if he did not believe that the jury performed its job appropriately, he would have said something. He did, however, remember moving for a new trial, in part, based on inappropriate contact with the jury. He thought "the jury did some social engineering," but did not raise it with the court, deeming it an irrelevant argument.

Dr. Kleinman testified at the PCR hearing that she had been hired by the trial attorney to evaluate defendant. She opined that defendant suffered from Battered-Woman Syndrome at the time of the crime. She felt that the trial attorney appeared extremely anxious during the trial and she did not believe that the jury understood the connection between defendant being battered and the crime for which she was convicted, mostly due to counsel's ineffective questioning of her during trial. She stated that his questioning never established the nexus between defendant's abuse and the crime. Kleinman opined that this was a critical piece of information missing from her testimony.

Kleinman believed that the State's expert was not an honest representative of the field of psychology and distorted and manipulated information during her testimony. She was present while defendant's attorney cross-examined the State's expert. Kleinman had prepared questions for the attorney to use both before and during trial. She said that the attorney had "a very difficult time asking a proper question" and Kleinman was so "troubled by his performance" that she called the Public Defender's office to express her concern that defendant was not properly represented.

The PCR judge placed a lengthy decision on the record in which he denied all post-conviction relief. ...

23

The judge next addressed the issue of ineffective assistance of counsel. First, he discussed defendant's claim that her trial counsel should have moved for a change of venue. The judge found that this issue should have been raised on direct appeal and that there was no evidence, such as a certification from a juror, that would justify relief from the requirement that the issue be presented on direct appeal.

As to the balance of the claims respecting ineffective assistance of counsel, to wit, failure to consult with defendant effectively, inadequate direct examination of Kleinman, inadequate investigation and cross-examination of the State's expert, inadequate preparation of defendant for her testimony, counsel's failure to explore discrepancies in bite marks and the medical examiner's toxicology report, counsel's failure to adequately explore juror involvement with the victim's family, and counsel's improper advice to reject the plea offer, the judge noted that defendant was required to prove by a preponderance of the evidence "that but for counsel's ineffective assistance the defendant would have either been acquitted based on her self-defense claim or perhaps convicted of a lesser included offense of manslaughter."

With respect to the alleged failure of counsel to effectively consult with defendant, the judge stated the controlling legal principles and found that defendant had not shown how counsel's alleged refusal to consult with her had prevented the attorney from properly investigating the case and developing a reasonable defense. The judge noted that defendant had not specified what information her attorney refused to use. As a consequence, the judge determined that he could not conclude that counsel acted unreasonably and that the outcome of the case might reasonably have been different. Additionally, the judge determined that trial counsel, a certified criminal trial attorney, effectively and vigorously represented defendant at trial and that none of counsel's actions "were outside the wide range of professional competent assistance."

As to alleged inadequate direct examination of Kleinman by defendant's trial counsel, the judge reviewed the transcript of her trial testimony and listened to her PCR testimony. The judge found that Kleinman at trial did testify

24

at length about the nature of the battered
women's syndrome and she even was allowed to
testify that in her opinion the defendant not
only suffered from battered women's syndrome
but that in the case at hand it was her
professional opinion that the defendant
feared for her life when she stabbed [the
victim]....

The only specific information ... that she
was not really allowed to render an opinion
about was to go further in her testimony and
to say that in her opinion the defendant
acted in self-defense when she stabbed the
victim ... and that failure of Mrs. Kleinman
to render that opinion was surely not the
product of ineffective assistance of
counsel.... The court had advised both
attorneys that whether or not the defendant
acted in self-defense was ... a legal and a
factual conclusion to be reached by the jury
and not one that was the proper subject
matter of expert opinion.

[I]t was the Court's ruling that prevented
[defendant's counsel] from eliciting that
testimony. And I'm satisfied ... that there
is really no additional testimony that she
could have properly given that would have
changed the outcome of these proceedings.

Furthermore, the judge took note of defendant's
trial testimony in which she conceded "that she had not
been threatened with any serious bodily injury
previously, that she had not been the subject of an
abusive or controlling relationship," and that such
testimony undermined her Battered-Woman-Syndrome
defense.

Regarding defendant's claim that defense counsel's
investigation and cross-examination of the State's
expert was inadequate, the judge was not satisfied that
it was unreasonable for defense counsel not to discover
that the State's expert had been administratively
sanctioned for practicing psychology without a license
fifteen years earlier. Additionally, the judge was not
persuaded that this old impeaching evidence would have
changed the outcome of the trial, because the State's

expert's testimony was based on her interview of
defendant, who denied suffering from factors that fit
the Battered-Woman Syndrome.

Next addressing defendant's claim that her counsel
inadequately prepared her for direct and
cross-examination, the judge found the attorney's
denial of this claim to be credible. He concluded that
it was understood at the outset that defendant would
claim self-defense and that she was likely to testify.
Furthermore, when the judge and defense counsel warned
defendant about the prospect of cross-examination at
trial, "she had indicated that she had adequate time to
consult with [her trial attorney] and that she had
voluntarily chosen to testify." The judge found that
her trial testimony "was a classic case of
self-defense" and that "cross-examination did not in
any way rattle her." He concluded that she was very
well prepared and the outcome of the trial would not
have been different.

...

Regarding the alleged involvement of one or more
jurors with the victim's family, defendant's claims
were based on her own testimony that an unbiased jury
would be impossible due to the victim's brother's
mayoral campaign. However, the PCR judge pointed out
that this issue should have been raised on direct
appeal. In any event, he observed:

There's no certification from any juror
indicating that there was a bias ... or that
any of them were tainted by pretrial
publicity.... The jurors in this case were
questioned extensively regarding [any
potential bias and] ... at the end of the
jury selection process both counsel conceded
to the Court that the jury was satisfactory.

Furthermore, the judge noted that when the issue
was raised at trial, he investigated the allegation of
juror contact with the victim's family and ascertained
that the person thought to be a juror was a "victim-
witness representative of the Prosecutor's Office,"
whose identification card was similar to those issued
to jurors. The judge concluded that this claim was
simply contrary to the evidence.

Finally, respecting counsel's alleged improper advice to reject the plea offer, the judge found that the defense attorney credibly testified that the prosecutor offered a plea to aggravated manslaughter with a sentence of twenty years, not the ten years to which defendant testified. The judge also found that "the defense position was that that was unreasonable and that she should go to trial." The judge also found that the performance of counsel was not deficient simply because he was optimistic about the defense he was presenting. The judge concluded that it was ultimately the defendant's decision to make and that she chose to go to trial.

The judge concluded:

And so after evaluating all the defendant's claims individually and in their entirety, I'm satisfied that the defendant has not demonstrated that she was denied effective assistance of counsel. The Court finds that the defendant was represented by an experienced and certified criminal trial attorney who has tried numerous homicide cases in the past. I'm satisfied based upon his testimony and the record before the Court that he spent months preparing the case for trial, that he met with the defendant numerous times, that he adequately prepared for trial, and that he presented the defenses that the defendant asserted and still asserts, that after consultation with her he concluded that there was a viable claim of self-defense based on the Battered Women's Syndrome. The Court had an opportunity to review his performance, the witnesses performance. He opened the case on that defense. He aggressively cross-examined the State's witnesses. Elected and presented defense witnesses in support of the claim and again he even retained one of the leading [pro]ponents, an expert in the Battered Women's Syndrome.

Defendant has not shown that any of these alleged actions by counsel were outside the realm of professionally competent assistance or that you should have done anything

27

differently that would have changed the outcome of the case. To be sure it is always possible to look at a case in hindsight and to allege that defense counsel should have done something different, particularly when there has been an adverse verdict. But as has been said many times the defendant is not entitled to a perfect trial. A defendant is entitled to a fair trial. She was not denied effective assistance of counsel. It has not been shown that based upon the performance of counsel that she could have done or should have done anything different that would have changed the outcome of the case. And therefore the petition for post conviction relief is denied.

...

When a defendant asserts that his counsel was ineffective, a constitutional issue is raised. In Strickland v. Washington, the United States Supreme Court explained the constitutional guarantee for effective assistance of counsel to every criminal defendant embodied in the Sixth Amendment. A two-prong analysis is required when evaluating such a claim.  To prevail, the defendant must first demonstrate that trial counsel committed serious professional errors. Second, defendant must demonstrate that the professional errors prejudiced the defendant to the extent that he was deprived of a fair trial. The New Jersey courts have adopted the standards embodied in Strickland. State v. Fritz, 105 N.J. 42, 57-58 (1987).

With respect to the first prong, "'[j]udicial scrutiny of counsel's performance must be highly deferential,' and must avoid viewing the performance under the 'distorting effects of hindsight.'" Moreover, there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, supra, ... . Adequate assistance of counsel should be measured by a "reasonable competence" standard. That standard does not require "the best of attorneys," but rather that attorneys not be "so ineffective as to make the idea of a fair trial meaningless."

With respect to the second prong, defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, <u>supra</u>, ... . "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" We have held that "to establish prejudice, a defendant must show not only that the outcome of [the] trial would have been different absent the alleged deficient representation, but also that the deficient representation rendered the result of [the] proceeding fundamentally unfair or unreliable." Even if counsel makes strategy miscalculations or trial mistakes, PCR relief is only available "in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial." The mere fact that a trial strategy fails is not necessarily proof of ineffective assistance of counsel. Rather, a defendant must demonstrate "how specific errors of counsel undermine the reliability" of the trial.

With respect to defendant's claim of ineffective assistance of counsel, the PCR judge clearly discharged his fact-finding duties. We have reviewed the record and conclude that his findings "could reasonably have been reached on sufficient credible evidence present in the record." We will not make new credibility findings. We are thoroughly satisfied that his fact findings were not clearly mistaken and thus "the interests of justice" do not "demand intervention and correction." Thus, we will not "appraise the record as if [we] were deciding the matter at inception and make [our] own findings and conclusions." As a consequence, we are satisfied with the correctness in each and every respect of the PCR judge's conclusion that the performance of defendant's trial counsel was not ineffective in a constitutional sense and that defendant had not satisfied the first prong of <u>Strickland</u>. Even if the PCR judge was incorrect in this respect, defendant clearly failed to satisfy the second prong of <u>Strickland</u>. Here, it was undisputed that while defendant was sitting in a car and the victim was leaning back against the car, defendant took an eleven-inch knife and stabbed the victim in the back. The applicability of the defense of Battered-Woman Syndrome was hotly contested with experts on each side of the issue. But, it was the testimony of defendant herself that seriously undermined her chance of success

29

> with this defense and she has utterly failed to
> demonstrate how any action or inaction of her attorney
> could raise a reasonable probability that the result
> would have been different had counsel been effective.
> Our " 'confidence in the outcome' " has not been
> undermined, and we are satisfied that the proceeding
> was fundamentally fair and reliable. We affirm
> substantially for the reasons expressed by the PCR
> judge in his comprehensive oral decision respecting the
> claim of ineffective assistance of counsel. R.
> 2:11-3(e)(2). The findings and conclusions of the judge
> are supported by substantial, credible evidence in the
> record.

State v. Tierney, 2007 WL 1836662 (N.J.Super. App.Div. June 28, 2007) (citations omitted).

Here, the Appellate Division correctly determined the governing Supreme Court precedent.  The decision of the Appellate Division was neither contrary to, nor an unreasonable application of, the Strickland standard.  Nor was the decision of the Appellate Division based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Petitioner has failed to establish a reasonable probability that but for any alleged deficiencies in trial counsel's preparation or presentation of the case the outcome would have been different.  The trial court and Appellate Division specifically found that trial counsel did communicate the prosecutor's plea offer and that there was no juror misconduct. Petitioner presented no evidence to suggest that a change of venue was warranted.  Nor is there any reason to conclude that

counsel was ineffective for failing to call as a witness a
photographer who had taken pictures of Petitioner's bruised
body;[4] there does not appear to have been any dispute that
Petitioner and the victim were involved in an extensive physical
altercation.  Finally, there was no error in the jury
instructions, and nothing to suggest that a more extensive
summarization of the testimonial evidence on battered woman's
syndrome in the charge would have altered the outcome of the
trial.  To the contrary, as the Appellate Division noted,
Petitioner's own testimony tended to undercut that defense.[5]

        For all of the foregoing reasons, Petitioner is not entitled
to relief on this ground.

C.    Errors in Presentation to Grand Jury

        Petitioner alleges that the grand jury proceeding was
defective because an investigator testified incorrectly about
several aspects of the incident, including the time a call was
made to police on the night of the murder, the presence of

---

        [4] With respect to this issue, the Court notes that
Petitioner testified to her injuries with reference to several
photographs, some of which were moved into evidence.  (Tr. of
June 20, 2000 at 51-58, 71, 153.)

        [5] For example, Petitioner testified that, before the night
of the murder, she never feared for her life or felt restrained
by the victim's behavior toward her.  (Tr. of June 20, 2000 at
81-82.)  Petitioner also testified that in previous physical
altercations with the victim she caused him injuries, including a
prior stab wound.  (Tr. of June 20, 2000 at 84-87.)

injuries on Petitioner, the details of witness statements, offers of favorable treatment to other defendants, etc.

The Fifth Amendment right to a grand jury presentation in felony cases is not applicable to the states. Alexander v. Louisiana, 405 U.S. 625, 633 (1972). Thus, any claim of defect in a state grand jury proceeding is a claim of a state-law error that does not raise federal constitutional concerns unless it rises to the level of a due process deprivation. See Estelle v. McGuire, 502 U.S. 62, 68 (1991). Cf. U.S. v. Console, 13 F.3d 641, 671-72 (3d Cir. 1993) (with the exception of a claim of racial discrimination in the selection of grand jurors, a petit jury's guilty verdict renders harmless any prosecutorial misconduct before the indicting grand jury) (citing Vasquez v. Hillery, 474 U.S. 254 (1986)). Where any error in a state grand jury proceeding is rendered harmless by a subsequent petit jury verdict, there is no due process deprivation. See, e.g., Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989); United States v. Mechanik, 475 U.S. 66, 72-73 (1986) (involving a violation of Fed.R.Crim.P. 6(d)).

The state courts rejected Petitioner's challenge to events before the grand jury.

> As to the claim raised with respect to the grand jury proceedings, the PCR judge initially determined that defendant was barred from raising the claim. "[D]efenses and objections based on defects in the institution of the prosecution or in the indictment or accusation ... must be raised by motion before trial."

32

> R. 3:10-2(c). "Failure to so present any such defense constitutes a waiver thereof...." Defendant has not shown good cause for relief from the waiver.
>
> ...
>
> As the PCR judge correctly found, the issues raised with respect to the grand jury proceedings were not likely to have precluded an indictment where it was undisputed that defendant stabbed the victim in the back. In any event, grand jury errors are rendered harmless in the event of a guilty verdict in the subsequent trial resulting from the indictment. State v. Lee, 211 N.J.Super. 590, 599 (App.Div.1986), certif. denied, 108 N.J. 648 (1987); United States v. Mechanik, 475 U.S. 66, 69-72, 106 S.Ct. 938, 941-44, 89 L. Ed.2d 50, 56-58 (1986).

State v. Tierney, 2007 WL 1836662 (N.J.Super. App.Div. June 28, 2007) (citations omitted).

The Appellate Division correctly applied the Supreme Court precedent governing this claim.  Any error in the state grand jury proceedings was rendered harmless by the subsequent petit jury verdict.  Petitioner is not entitled to relief on this ground.

D.   Cumulative Error

Petitioner contends that the cumulative effect of the alleged errors deprived her of her constitutional right to a fair trial.  Although Petitioner raised this claim at all levels of her state petition for post-conviction relief, it does not appear that any state court, in denying relief, ever expounded on its reasoning for denying this claim.

33

Even if none of Petitioner's claims on its own amounts to a constitutional violation, the "cumulative effect of the alleged errors may violate due process." United States ex rel. Sullivan v. Cuyler, 631 F.2d 14, 17 (3d Cir. 1980); see also Pursell v. Horn, 187 F.Supp.2d 260, 374 (W.D. Pa. 2002) ("That the reliability of a state criminal trial can be substantially undermined by a series of events, none of which individually amounts to a constitutional violation, is an idea that has been accepted by nearly every federal court to have addressed the issue."). Neither the Supreme Court nor the Court of Appeals for the Third Circuit has established a standard by which a claim of cumulative error must be determined. See Pursell, 187 F.Supp.2d at 374-76 (describing three alternative approaches).

This claim is plainly meritless. Most, if not all, of the claimed errors are not errors at all. Certainly, nothing presented in this Petition suggests that Petitioner was deprived of her constitutional right to a fair trial. Petitioner is not entitled to relief on this claim.

## IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional

34

right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Petitioner has not made a substantial showing of the denial of a constitutional right.  Jurists of reason would not disagree with this Court's resolution of Petitioner's constitutional claims.  Accordingly, no certificate of appealability shall issue.

## V.   CONCLUSION

For the reasons set forth above, the Petition must be denied.  An appropriate order follows.


S/Susan D. Wigenton
Susan D. Wigenton
United States District Judge

Dated: April 2, 2009